# EXHIBIT F



Never miss our most important stories. Sign up for the weekly Ars newsletter.

MAIN MENU ⌄    MY STORIES: 25 ⌄    FORUMS    SUBSCRIBE NOW                    SEARCH                    LOG IN

# LAW & DISORDER / CIVILIZATION & DISCONTENTS

## Pioneering patent troll seeks the Supreme Court's ear—plus a cool $12 million

Rates Technology Inc. says Best Buy broke a deal by challenging its patents.

by Joe Mullin - Oct 7 2012, 5:30pm EDT                                                           25



flickr / comedy_nose

Jerry Weinberger was in the patent trolling business before it was cool—in fact, before anyone had even been called a "patent troll."

Weinberger and his company, Rates Technology Inc., (RTI) began suing over a small batch of patents in the mid-90s. Ultimately, they filed 89 suits before the year 2000 (only Jerome Lemelson was a heavier patent litigant at that time). Using a small batch of patents, Rates Technology stayed on the top ten list of "non-practicing entities" through 2010, according to statistics [PDF] compiled by PatentFreedom.

This week, Weinberger and his lawyer took an unusual step: asking for a hearing at the Supreme Court. In recent years the court hasn't been very friendly to patent owners in general—and it certainly hasn't been sympathetic to the non-practicing companies that get called patent trolls. (In the few interviews he's given, Weinberger vociferously disputes the idea that he's any kind of patent troll; a call and e-mail to his lawyer today were not returned.)

The reason, according to Rates Technology, is that one of the company's many licensees—Best Buy, which was briefly in the VoIP business when it bought Speakeasy broadband back in 2007—broke a promise it made to never challenge RTI's patents. So far, the courts have sided with Best Buy, saying that contract isn't enforceable and Best Buy/Speakeasy has a right to challenge the patents regardless. RTI's petition to the Supreme Court has to be seen as a longshot; about 1 percent of those asking for a hearing at the high court are ultimately heard.

Documents from the case reveal what kind of deals got struck by one of history's most successful patent-licensing operations of all time. And this also has implications for how Rates Technology's fellow patent-holding companies will behave in the future.

TOP FEATURE STORY ⌄



FEATURE STORY (3 PAGES)

### Future of mobile CPUs, part 2: What's ahead for the major players?

Apple and Samsung face different challenges than Nvidia, Intel, and Qualcomm.

65

STAY IN THE KNOW WITH ⌄

LATEST NEWS ⌄

**MWC 2013: Bigger handsets, smaller tablets, more phablets**

DEMILITARIZED WEB
**North Korea to allow mobile Internet for foreigners**


**iOS app-a-palooza: MLB At Bat, Mokriya for Craigslist, and more**


**Is it really so bad to develop on a production server?**

## The RTI deal: $475k to go away; $12 million if you fight

Rates Technology has sued more than 100 companies, and the company has succeeded in settling most of them without going to trial. RTI even convinced Google, a company that often takes the expensive step of standing up to patent trolls, to [ ] a lawsuit in 2006. It's a remarkable tally for a company that keeps wielding the same two patents. Most trolls of that size, like Acacia Research, have a giant stable of patents to fuel their litigation.

Weinberger calls the suits justified because he invented "least cost routing," a technology used in most VoIP services, back in the 1970s.

In 2007, Weinberger and his lawyer got Best Buy to take a license for its newly purchased telecom company without even filing suit; the payment was revealed in later court documents to be $475,000. This agreement wasn't exactly a settlement, because technically, there hadn't been a lawsuit. It was just a "covenant not to sue." Best Buy and Speakeasy agreed to cut the $475,000 check, and not ever challenge the validity of the patents, or to assist others in challenging them. If the contract was broken, they'd have to pay $12 million.

Like Best Buy, many companies seemed to have paid RTI's fax without fighting in court; in a 2005 [ ], Weinberger claimed to have licensed "800 to 900 companies," far more than he has sued.

In 2010, SpeakEasy [ ] with two other companies: Covad Communications and MegaPath. That woke up Rates Technology to Covad; the company quickly decided Covad was infringing its patents too, and came knocking asking for its usual payment. RTI uses a tiered system based on a company's worldwide sales to determine payment. But Covad didn't roll over. Instead the company filed its own lawsuit to invalidate the Rates Tech patents.

That challenge violated the contract with Best Buy, in the view of Rates Tech. Sure, the company wanted to treat Covad as a different entity when it came time to collect its check. But after Covad fought back, it wanted Covad to be bound by the old agreement, and forced to pay the $12 million penalty.

A federal judge disagreed with Rates Tech, though, and that decision was [ ] on appeal. The appeals court found the "covenant not to sue" was similar enough to a license, and noted the public had an interest in allowing patents to be challenged in court.

## Sue First, Ask Questions Later

Many patent-licensing companies have already [ ] the idea of simply filing an infringement lawsuit with no warning. In the wake of the Supreme Court's [ ] decision. That case made it much easier for defendants facing threats to file their own preemptive lawsuit, and take away the patent-holders' choice of venue. Rates Technology says its situation is different from the MedImmune case, because its settlements are "lump sum" payments and not ongoing royalties. If it stands, and it is likely to do so, the Rates Tech case will increase that pressure.

READER COMMENTS   25


/ Joe Mullin has covered the intersection of law and technology — including the world's biggest copyright and patent battles — for a number of years, mostly at The American Lawyer.
Follow @JoeMullin

OLDER STORY                    NEWER STORY

YOU MAY ALSO LIKE



Let's talk PS4: will it take console gaming to the next level?

Sony PS4 rumors confirmed and 11 other posts you may have missed this week



# The National Business Review

5:56AM Tuesday 26 February 2013

**Hot Topics:**   Xtra spam   |   Mainzeal   |   Earnings season

# Patent troll bites Google

Francis Till: May wind up with broken teeth   |   Friday December 30, 2005

Yet another patent troll is making headlines, this time by bringing suit against Google for infringement of patents that deal with "least cost routing" in relation to its VoIP offer, Google Talk.

The claim is being touted as having widespread potential implications for VoIP implementations.

The litigious company, Rates Technology, Inc, is New York (Smithtown) based and incorporated in Delaware. The lawsuit was brought in the United States District Court for Eastern New York and the complainant's brief is available here in PDF format (courtesy Search Engine Watch, which surfaced the story of the Google lawsuit here).

The PDF includes copies of the two patents in question, shorthanded as 085 and 769, issued in 1995 and 2001. Both patents deal with processes rather than inventions and both are designed to enable a POTS telephone user to make long distance land line calls at the cheapest available rate through the intermediate use of a database that contains telephone company pricing information.

According to the Rates Technology brief, however, the patents apply to VoIP technology, in at least the form Google is using it.

The brief says Rates Technology attempted to license the technology to Google by pushing its patent claim, but was rebuffed.

The lawsuit was subsequently filed on 05 October 2005 and according to the docket is set down for an initial conference in February 2006 before Magistrate-Judge E Thomas Boyle.

The complaint asks for a jury trial.

In researching the case, SEW's Gary Price uncovered a blog posting from TMCnet publisher Rich Tehrani, in which Mr Tehrani disclosed the contents of an April 2005 telephone interview he conducted with Rates Technology CEO, Jerry Weinberger, who -- unlike many patent trolls -- holds the patents as inventor.

In the course of that interview, it developed that Rates Technology had been trolling with considerable success for years.

Mr Weinberger said the company -- which has no declared purpose but to sell Covenant Not Sue ("CNS") agreements -- had litigated about 25 times over 15 years and had reached license agreements with between

700-800 companies.

Litigation appears to have historically resulted in settlements rather than verdicts and one such settlement is abstracted here, between Mediacom Corp and Rates Technology, in which the company representing Mediacom, Boston-based IP specialist firm Bromberg & Sunstein, "negotiated a favorable settlement" for Mediacom.

Mediacom is self-described as America's 8th largest cable television company and bundles broadband and telephony in with television.

The terms of that settlement were not disclosed, but lawsuits have also been filed against Nortel, Centrepoint Technologies, Mitel Networks ($US945 million) and Alcatel ($US1.155 billion), all in various states of progress, Mr Tehrani said, citing the interview.

In addition, Hello Direct, GN Netcom and GN had all reached settlements with Rates Technology following litigation, Mr Weinberger told Mr Tehrani, and all settlements were being kept confidential.

What seems to make Rates Technology successful in its patent trolling is the cost of litigation, which Mr Weinberger put at around $US2 million.

He told Mr Tehrani that larger companies tended to take up the Rates Technology offer of a license because they understood the business case against litigation.

That apparently does not apply to Google, which is a company not merely large enough to put the litigation costs on its snack bar bill but staffed with some of the most IP conscious lawyers -- and engineers -- in the world.

By picking Google as a target, Rates Technology may have failed to understand that for a company made of little but IP, defending against spurious (or even substantive) patent infringement claims is a necessity and not an inconvenience.

In following up on the SEW story, CNet's Elinor Mills was unable to extract comment from Rates Technology or its lawyers, but said Google had issued a short statement: "We believe the lawsuit is without merit and we will defend against it vigorously."

Trolls back under the bridge, please.
**More by Francis Till: May wind up with broken teeth**

# THE JOHN MARSHALL
# REVIEW OF INTELLECTUAL PROPERTY LAW



## THE TROLL NEXT DOOR

### JENNIFER KAHAULELIO GREGORY

#### ABSTRACT

The term Patent Troll is increasingly permeating news headlines. This comment explains where the term came from and how the changing landscape of patent enforcement has contributed to the evolution of the Patent Troll. Some have suggested that segregating Patent Trolls from other patent enforcers will solve many of the patent system's woes. This comment analyzes proposed ways of distinguishing Patent Trolls and reveals them all as prejudicial and ineffective. The use of the term Patent Troll is a mask for underlying fears based on real shortcomings in the patent system, which need to be addressed.

Copyright © 2007 The John Marshall Law School



Cite as Jennifer Kahaulelio Gregory, *The Troll Next Door*, 6 J. MARSHALL REV.
INTELL. PROP. L. 292 (2007).

The most heavily criticized characteristics of Patent Trolls are that they do not practice the patent they hold,[76] and that they make frivolous allegations of infringement.[77] Some critics argue that patents should not be enforced like traditional property rights, but should only be enforced when doing so serves the public good.[78] Part A of this section analyzes whether isolating Patent Trolls on the basis of whether they are "practicing" the patents they hold is feasible. Part B of this section analyzes whether making frivolous allegations is a useful basis for defining who is and who is not a Patent Troll. Part C of this section examines whether enforcing patents only for the public good can help differentiate a Patent Troll from other patent holders.

### A. Non-practicing Entities

A 2003 report by the Federal Trade Commission used the term "non-practicing entities" ("NPEs") to refer to Patent Trolls.[79] This term highlights the characteristic most frequently used to identify a Patent Troll; whether or not the patent holder practices the patent.[80] In *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, the Supreme Court stated that a patent holder has "the privilege of any owner of property to use or not use it, without question of the motive."[81] Nevertheless, one of the main complaints made by defendants in infringement actions is that the patent holder is not using or "practicing" the patent.[82]

The term "practicing" a patent can refer to product manufacture or new product development, but merely licensing or litigating is not included.[83] The CEO of Rates Technology is the inventor of the patents the company holds, but because Rates is not making any products,

---

[76] *See* Brief of Petitioners, *supra* note 444, at 24 (expressing concern about "non-practicing entities"); Brief for Computer & Communications Industry Association, *supra* note 422, at 14 ("Easily asserted patents, endowed with automatic injunctive relief, become potent weapons in the hands of non-producing patent firms, sometimes referred to as 'trolls.'"); Brief of Research in Motion, Ltd. as Amicus Curiae in Support of Petitioners at 2, eBay, Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837 (2006) (No. 05-130).

> Ever growing numbers of companies are acquiring patent portfolios and using these patent portfolios to extract royalties from existing products and services. These patent assertion companies do not use their patents and know-how to make new products or services available to the public . . . their sole activity is to identify existing products or services in the marketplace against which they can assert their patents.

*Id.* at 2.

[77] *See* Berman, *supra* note 13, at 22 (stating that the term patent troll has become synonymous with the unfair assertion of questionable IP rights).

[78] Brief of Malla Pollack et al., Supporting eBay Inc., et al., at 17, eBay Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837 (2006) (No. 05-130).

> The United States Constitution defines the public interest goal of patent statutes as the distribution of new technology. A patentee who does not practice his or her invention within the United States is undermining the public interest which founds legal recognition of personal patent rights. Therefore, a patent holder who is neither practicing the infringed invention nor making a good-faith effort to prepare to practice the invention should be presumed to fail the public interest prong [of the test to determine whether a patent holder can obtain an injunction when their patent is infringed].

*Id.* at 17.

[79] THE FEDERAL TRADE COMMISSION, TO PROMOTE INNOVATION: THE PROPER BALANCE OF COMPETITION AND PATENT LAW AND POLICY 31 (Oct. 2003), *available at* http://www.ftc.gov/os/2003/10/innovationrpt.pdf.

[80] *Id.*

[81] Cont'l Paper Bag Co. v. E. Paper Bag Co., 210 U.S. 405, 429 (1908).

[82] *See* Brief of Malla Pollack, *supra* note 78, at 17.

[83] THE FEDERAL TRADE COMMISSION, *supra* note 13, at 17.

commentators still refer to the company as a Patent Troll.[84]  Rates Technology's main business is licensing, and it has arranged licensing agreements for its patents with over 700 companies and has also sued Google for infringement.[85]  Because Rates Technology has no other corporate activity besides IP litigation and licensing, the media sees them as an NPE and has labeled them a Patent Troll.[86]

A contrasting example is Eastman Kodak Co., a company which recovered nine-two million dollars from Sun Microsystems for infringement on a patent that Kodak had inherited and was not using.[87]  No one has ever called Kodak a Patent Troll, even though it was not "practicing" that particular patent.[88]  Many large manufacturers create a strategic advantage by holding unused patents in their patent portfolio, and forcing competitors to come to them for licenses in order to use the patented technology.[89]  Also, many individual inventors hold patents on their inventions, but they have neither the expertise, nor the money to manufacture them.[90]  They could also be called NPEs and would be excluded from enforcing their patent rights if this characteristic were used to identify and weed out Patent Trolls.[91]

An identifying feature of an NPE is that the majority of revenue coming into the company is from licensing patents.[92]  One example is NTP, Inc., a small Virginia corporation formed by one inventor and one lawyer, whose sole lucrative business practice has been to license the patented technology of the inventor.[93]  In March 2006, NTP negotiated a $612.5 million dollar settlement

---

[84] Till, *supra* note 3.

[85] *Id.*

[86] *See id.*

[87] Martin Lueck et al., *"Patent Troll:" A Self-Serving Label that Should be Abandoned*, Sept. 28, 2005, http://www.rkmc.com/Patent_Troll_A_Self-Serving_Label_that_Should_be_Abandoned.htm.

[88] *Id.* (stating that under many definitions of a patent troll, Kodak would appear to be engaging in improper conduct, when in fact they are merely operating within the rules of the system). Individuals and organizations enforcing patent rights, whether invented or acquired, whether a manufacturer of patented technology or not, are exercising a legal right, and that constitutional right should not be denied. *Id.*

[89] JAFFE & LERNER, *supra* note 188, at 57. An early example is Texas Instruments, who had "virtually no licensing revenues when it decided to assert a number of the patents in its portfolio against its competitors in the mid 1980s. This strategy was so successful that by 1999, the firm was estimated to be earning $800 million from patent licensing revenues, which represented more than 55% of Texas Instrument's total net income." *Id.*

[90] Lueck et al., *supra* note 88.

[91] *U.S. Debates Restriction of "Patent Trolls"*, TAIPEI TIMES, Mar. 21, 2005, at 11, *available at* http://www.taipeitimes.com/News/biz/archives/2005/03/21/2003247222. Peter Detkin stated, "the term 'patent troll' [should not] apply to all patent owners who demand royalties from others without making the product themselves. Thomas Edison never made any products. We have to be careful because a lot of the behavior we're talking of curbing would have curbed Thomas Edison." *Id.* Edison had more than 1000 patents and founded a company that later became General Electric, Co., the world's second-biggest company by market value. *Id.*

[92] *Everyone Sick of BlackBerry Patent Battle*, ASSOCIATED PRESS, Nov. 21, 2005, http://www.foxnews.com/story/0,2933,176239,00.html; *see also* William M. Bulkeley, *Patent litigants pose growing threat to business*, WALL ST. J., Sept. 14, 2005, at A1; Chris Carson, *"Patent Trolling" Firms Sue Their Way to Profits*, MSNBC.COM, Mar. 18, 2006, http://www.msnbc.msn.com/id/11860819/from/RSS/. An example is Forgent Networks, with thirty employees and a law firm, who made eighty percent of their revenue in the last quarter of 2005 from licensing deals on just one digital image patent it obtained years ago in an acquisition. *Id.* The company's CEO, Dick Snyder, says, "This country was built on innovation, and in the Constitution there is a provision in there to protect innovation through patenting. It's the American way, and we're just doing what we believe is the right thing to gain value from what we own." *Id. But see* JAFFE & LERNER, *supra* note 18, at 57 (noting Texas Instruments makes fifty-five percent of revenue from licensing, but has not been labeled a patent troll).

[93] *See Everyone Sick*, *supra* note 92. NTP was co-founded by Thomas J. Campana, Jr. and a northern Virginia attorney, Don Stout to protect the patent obtained by Campana for a system to send e-mails between computers and wireless devices. *Id.*

sp | Patent Reform

**LEGAL POLICY**



# Patent Trolls Erode the Foundation of the U.S. Patent System

By Daniel P. McCurdy

CLIMBING OUT OF THE DEEP economic recession the United States is facing will require multiple remedies, but there is no doubt that ongoing innovation will be critical to restoring the long-term economic health and prosperity of our country. Innovation is so key to our nation's prosperity that our founders enshrined the general principle of intellectual property as an essential element of economic development in Article 1, Section 8 of our Constitution. The basis for this constitutional provision establishing a patent system was not the protection of individual rights to inventions *per se*, but rather the promotion of economic development in a young and ambitious country.

As originally conceived, the patent system would catalyze economic development by providing individuals (and those investing in the inventive process) the prospect of a return on that investment

should the invention achieve market success, while ensuring the public had the ability to learn from the invention to enable follow-on research and development. The fundamental policy intent of the patent system still holds true nearly 220 years later.

Patents are created for a single purpose—as an incentive to encourage innovation and, through such innovation, to increase the general economic well-being and prosperity of the nation. In recent years, however, much in the practice of intellectual property management has changed in ways that are inconsistent with the public policy objectives that were the foundation for the patent system. Left unchecked, some of these new approaches threaten to undermine this patent system and our prospects for renewed economic growth.

By far, the most significant and destabilizing change in the patent environment since 2003 has

been the dramatic increase in the growth, financing, and patent acquisitions of so called non-practicing entities. NPEs in legal parlance—more commonly referred to as "patent trolls"—derive or plan to derive all or most of their revenue from the enforcement of patents. Patent trolls are clearly distinguishable from major research institutions, universities, and businesses that derive their revenue, respectively, from funded research, tuition and grants, and the sale of products and services. Some of the largest of these NPEs raise large funds with which to purchase the patents they seek to enforce—without any plans to turn those patents into marketable products or services. Instead, they then use these funds to enable—through direct or veiled threats of infringement—their pursuit of royalties from successful businesses.

Many factors have come together to foster this phenomenon. These include the cheap cost of capital until the financial crisis of mid-2008, an openness to new investment vehicles among institutional investors, and a large number of patents available for sale. Many of these patents are of questionable validity at the individual level, but in the aggregate become more valuable because of the cost to a potential licensee of separating the rare grains of wheat from the chaff.

The jump in patent troll-related lawsuits is truly alarming. From October 1, 1994 through Septem-

ber 30, 2002, 527 patent lawsuits were filed by or against the 219 NPEs currently identified and tracked by PatentFreedom. This represented 2.7 percent of patent lawsuits filed in the United States during that 8-year period. From October 1, 2003 through September 30, 2007, there were 1,210 lawsuits filed by or against these entities, representing approximately 8.4 percent of all patent lawsuits filed in that period, and exceeding 10 percent in 2006 and 2007 (see Figure 1).

Over the past year—from October 1, 2007 through September 30, 2008—389 litigations were filed involving the PatentFreedom-tracked NPEs, compared with 297 in the prior year. Today, 219 patent trolls boast more than 800 subsidiaries or perhaps as many as 1,500 if all of the subsidiaries of the largest NPE, Intellectual Ventures, were known. Combined, all of these subsidiaries have more than 12,500 active and pending U.S. patents in their holdings. And in all likelihood, these numbers dramatically understate the magnitude of the problem.

For instance, these figures include only 3,167 U.S. patents and applications held by Intellectual Ventures, a mere fraction of the more than 23,000 worldwide patent assets they claim to own, most procured with a portion of the $5 billion in private capital they have raised to date. Intellectual Ventures is unique by virtue of its capital structure, its collection of signatory operating companies, its public relations capabilities, its leadership, and its patent portfolio. But it shares a probable requirement with other NPEs—it will likely have to follow the path of litigation.

The reason: Whether a large private equity fund like Intellectual Ventures or a more focused patent aggregator with less available capital, investors in patent trolls expect a return on their investment. Persuading a company to pay for a license to patents that the potential licensor may feel are invalid or not infringed is a difficult task. For this reason, as the amount of patent royalties requested increases, the chance that litigation will be required to untangle the debate over validity and infringe-



FIGURE 1
**Lawsuits by patent trolls on the rise**
*Percentage of intellectual property-related lawsuits by non-practicing entities to total IP-related lawsuits*

% cases filed by NPEs

% total IP cases

Source: PatentFreedom ©2008. Data Captured as of November 2008.

sp | Patent Reform

ment also increases. When NPE funds are very large, the returns they require to satisfy investors are commensurately large. Thus, it is likely that notwithstanding its stated desire to avoid litigation, Intellectual Ventures will ultimately have to follow the litigation path used by other NPE funds.

But even with litigation, profits, will be dependent on legal findings of validity of the patents asserted, then infringement of the patents, and then substantial damages. There exists the potential, however, that damages could be seriously limited by new laws or jurisprudence affecting damages calculations, such as those reflected in the on-going "proportional damages" debate. Finally all of these findings would have to stand up to the scrutiny of appeal.

The losers in this process will be businesses, consumers, and an overburdened court system, all made possible by the collection of funds from investors that enable patent trolls to amass new inventions that would spur national economic growth under the assumed but incorrect premise that patents are individual rights with discrete monetary value rather than a government tool of economic development enabled by the conveyance of certain rights to inventors and those that invested in them.

### The Patent Troll Realm

Beyond Intellectual Ventures, the remaining 218 PatentFreedom-tracked NPEs have varied backgrounds. Some, like Acacia Technologies, Alliacense Ltd., and Rembrandt Technologies, are primarily patent enforcement entities that are highly selective in their purchases. They have relatively small and focused patent portfolios. They rely substantially on litigation to demonstrate their commitment to enforce. Acacia, for example, since its inception in January, 1993 through August, 2008 has itself or through companies it has acquired been a plaintiff in 280 patent lawsuits (and a plaintiff or defendant in 308 lawsuits) seeking to enforce at least 121 of the 274 issued patents identified to date by PatentFreedom.



FIGURE 2
**Patent trolls clog up the courts**
*Number of patent lawsuits by non-practicing entities: 1994–2008*

Patent lawsuits involving NPEs, 1994–2008

Source: PatentFreedom ©2008. Data Captured as of November, 2008.

Moreover, those NPEs that are heavily litigation-focused have substantially increased the scope and pace of litigation. This increase takes two forms. The first is the absolute number of litigations filed (see Figure 2) and the second—frequently overlooked—is the number of defendants named in each lawsuit, which if properly reflected, substantially increases the scope and scale of NPE litigation. As an indication of this increase, see Figure 3.

Other NPEs are not so litigious. Firms such as 1st Technology, ArrivalStar, Cygnus Telecommunications Technology LLC, Freedom Wireless, Inc, Millennium LP, and Rates Technology derive or plan to derive the majority of their revenues from patent enforcement, but rather than buying patents created by others they primarily or exclusively license patents created by their employees or owners. A third category involves individual inventors who have chosen to enforce their patents as the primary means to derive revenue from them.

The patent litigation practices of these last two groups of patent trolls at first glance may not seem to be as egregious. After all, they are at least seeking to profit from their own ideas, rather than the ideas of others. Yet they are clearly akin to Intellectual Ventures and other patent aggregators in that they are using a patent system designed to promote the economic development of a nation through the cre-

FIGURE 3

**Patent trolls cast wider net**

*IP court cases involving select non-practicing entities*

| NPE Name | Total Cases | Cases since 2003 | % of Total since 2003 |
|---|---|---|---|
| Acacia Technologies | 308 | 239 | 78% |
| Rates Technology Inc | 130 | 38 | 29% |
| Millennium LP | 99 | 90 | 91% |
| Cygnus Telecommunications Technology LLC | 69 | 31 | 45% |
| General Patent Corp International | 66 | 36 | 55% |
| Plutus IP | 59 | 59 | 100% |
| Papst Licensing GmbH | 59 | 31 | 53% |
| F&G Research Inc | 56 | 51 | 91% |
| Ronald A Katz Technology Licensing | 54 | 48 | 89% |
| Catch Curve Inc | 53 | 36 | 68% |

Source: PatentFreedom ©2008. Data Captured as of August 31, 2008.

ation of new products and services to, alternatively extract profits from new products and services developed by other companies, potentially harming both consumers and competition.

All patent trolls share a common attribute: the primary source of their revenue is extracting royalties from companies they believe are using inventions claimed in patents they own. And because these NPEs do not derive any significant portion of their revenue from designing, developing, manufacturing, or selling products, they are essentially immune to counter-assertion claims by the companies from which they seek royalties. This profound disparity in NPE vs. product company assertions, as opposed to product company vs. product company assertions, has destabilized the patent system.

## THE DESTABILIZING IMPACT OF PATENT TROLLS

Because these entities and individuals do not produce products, there is some question as to how their enforcement activities contribute to the "first principle" underlying the creation of the patent system—to encourage economic growth made possible by encouraging innovative new technologies that would foster the introduction of valuable new products and services to the market. The creation

of an idea is frequently the least costly and least time-consuming aspect of product success.

Development budgets vastly exceed research budgets in research and development-intensive companies. Much more time, and substantially more investment, is required to commercialize a product or service embodying an invention than to create the invention in the first place. When I was director of business development for IBM Research in the early- to mid-1990s, for example, the global development budget exceeded the global research budget by about 20 times. R&D spending and development spending has fallen since then, but the proportional differences remain similar today.

Even if this were not the case, the tremendous financial and tactical advantages NPEs have over their business targets are huge. When one business asserts patents against another, both have the opportunity to reduce or eliminate the assertion by counter-asserting patents of their own against key products of the aggressor. In addition, both have the opportunity—if successful in proving infringement of a valid patent—to obtain an injunction that could severely damage the other's business operations. Neither of these defenses is available to a business when confronted with a patent assertion from a patent troll.

**sp** | Patent Reform

In fact, by choosing to not pursue products or services using their invention (or attempting product sales and failing) an NPE is actually *rewarded* with these tactical advantages. This can actually serve to diminish competition, and increase prices to consumers, by rewarding entities to not put products and services in the market but rather taxing those that do.

To compound the disadvantage faced by businesses, many NPEs operate in a stealth mode, hiding behind tens or even hundreds of subsidiaries, masking their patent holdings, their finances, and their activities so that they can sue for patent infringement only after the market has locked into using the covered technology. The many NPEs that purchase the patents they enforce can develop highly tailored portfolios focused on the most successful products of their intended licensees, with acquisitions sufficiently deep and broad to achieve an overwhelming assault.

This is in stark contrast to their targets, most of which are public companies that must reveal, by regulatory mandate, virtually everything about themselves, their products, their strategies, and their finances. Left unchecked, these tactics will enable NPEs to further enhance the vast amount of capital they have already obtained from pension funds, hedge funds, endowments, and other sources of alternative investments, including even other businesses.

Acacia for example, has a wide array of institutional investors, including fund managers Fidelity Management & Research, Vanguard Group, Oppenheimer Group, and Barclays Global Investors, hedge fund Kingdon Capital, private equity firms Apex Capital and Pequot Capital, and the giant U.S. teachers pension fund TIAA-CREF. Or consider Germany's IPCom GmbH which reportedly is funded by one of the world's largest hedge funds, Fortress Investments.

Armed with private capital, patent trolls are able to purchase large patent portfolios with absolutely no intention of producing meaningful revenues from products or services. Their extraction of royalties from product companies either diverts funds from the research and development needed to fuel continuing innovation that will drive economic development, or raises prices paid by consumers. And to what end?

### Patent trolls' hollow market arguments don't ring true

Some NPEs argue that their presence provides needed liquidity to inventors that may otherwise never obtain any return on their investment, spurring those inventors to further innovation. But that argument is hardly credible when most patent trolls offer such trivial rewards to the inventor. Indeed, the principal exception—General Patent Corporation, which has a long history of supplying enforcement services to small- and medium-sized inventors, with a substantial portion of the royalties provided to the inventor—proves the point. More frequently, NPEs with hundreds of millions or billions of dollars in capital seek out patents held by others and pay the actual inventors a small fraction of the money they seek to obtain in subsequent enforcement activities. It is hard to imagine that the prospect of netting so small an amount will, on its own, stimulate further innovation.

In fact, patent trolls could alter their behavior if they truly believed their objective was to be an advocate and defender of the small inventor. They could:

- Attempt to enforce only those patents they could demonstrate were clearly valid and infringed by fully applying Rule 11 of the Federal Rules of Civil Procedure, which prescribes sanctions for the filing of a frivolous lawsuit
- Avoid predatory massing of patents through acquisition that is intended to overwhelm a potential licensee
- Practice full disclosure and transparency in their funding, patent holdings, and practices
- Commit to the return of the majority of royalties to the original investor or inventor who created the technology.

Even with these changes, patent trolls would still remain a dangerous threat with significant advantages over businesses, but the changes would help to level the playing field. These commitments, however, will be difficult for most NPEs to make. Most patent trolls have already made promises to their investors that they will buy low, sell high, and keep the vast majority of the proceeds. The intended winner is not the inventor, but the NPE.

That's why the United States (indeed, the world community) needs a fully functional and transparent Patent Exchange, where every seller could advertise the availability of their patent to every potential buyer in a public forum so that companies potentially threatened by a patent at least would have the opportunity to purchase the asset. A Patent Exchange would help to establish greater competition for the asset at whatever stage the patents were offered for sale, thereby enhancing the reward to the innovator. And it would enable patent-acquisition entities, such as Allied Security Trust, RPX, and Open Invention Network—all of which were created in whole or part to combat NPEs and those wishing to stifle innovation—to participate in patent acquisitions as an alternative to inventors settling for offers from patent trolls that have not been thoroughly exercised in a competitive marketplace.

But not all businesses boast the financial firepower to join patent-acquisition entities or to individually ward off NPE-induced patent litigation by striking royalty deals. Smaller or less successful competitors cannot afford to pay the huge royalties asked by a never-ending stream of litigious patent trolls. Therefore, these smaller players, who can provide meaningful innovation and apply critical competitive pressures on industry leaders, face patent uncertainties (as do their potential customers) that are avoided by the larger, licensed market leaders, thereby potentially solidifying the market leaders' positions.

In short, patent trolls may be a compelling (yet still unproven) business model, but they do nothing to contribute to innovation or the nation's economic prosperity. In fact, they severely complicate

the ability of businesses large and small to produce products and services that produce jobs and rebuild our nation's (and workers') economic health. Indeed, the unpredictability that *any* product can be made, used, or sold without the very real risk of a devastating onslaught of patent attacks results in a marketplace in which innovation and competition are stymied. This is no way for our patent system to work as the United States tries to innovate its way out of today's deep economic recession.

## ADDRESSING THE TROUBLE WITH PATENT TROLLS

Fortunately, some meaningful actions have already been taken by the Supreme Court and the Court of Appeals for the Federal Circuit to deal with issues that have exacerbated the NPE problem. First, the *eBay* decision by U.S. Supreme Court in 2006 removed the so-called "automatic injunction" remedy for plaintiffs in a patent dispute, replacing it with the established "four factor" test to determine whether an injunction should be granted. This test will be difficult for an NPE to pass. Second, the *MedImmune* decision by the Supreme Court in 2007 permits a licensee to challenge the validity of a patent while still paying royalties. This removed the prior requirement that a licensee must first cease royalty payments, thereby triggering a breach and termination of the license and exposing itself to willful infringement and treble damages.

Third, the Federal Circuit in the *Sandisk* decision in 2007 dramatically lowered the threshold required for a company approached by a patent holder to seek a declaratory judgment from a court selected by the threatened party. Under *Sandisk*, the offer of a license, coupled with the rejection of the offer by the intended licensee, constitutes sufficient controversy to sustain a declaratory judgment action. That said, many operating companies are reluctant to initiate a lawsuit that, on average, will cost $5 million prior to its conclusion.

Fourth, the *KSR* decision by the U.S. Supreme Court in 2007 initiated a vital reassessment of the obviousness standard. A patentable invention must pass three key tests: it must be novel (new, not previously known); it must be useful; and it must not be obvious. Over the past decade in particular, there has been mounting criticism with respect to the quality and validity of patents issued by the U.S. Patent and Trademark Office. In particular, many observers charge that issued patents fail to pass the novelty or obviousness tests and are therefore invalid. The *KSR* decision held that when dealing with a patent that covers improvements over the prior art (as most do), a court must now ask whether the improvements are more than the predictable use of prior art elements according to their established functions.

The final two notable cases of importance to better managing the threat of NPEs are the *Quanta Computer* decision this year by the U.S. Supreme Court and the *Bilski* decision by the Federal Court of Appeals, also earlier this year. *Quanta* clarifies and strengthens the principle of "patent exhaustion," holding that a license to make a product "exhausts" the ability of the licensor to then claim infringement by the products that were actually produced. This ruling will materially limit some of the adventurous practices of NPEs with respect to chasing the entire value chain of a product, from manufacturer through to the consumer. And the *Bilski* decision significantly curtailed the patentability of business methods (a favorite category of patents being amassed by NPEs) that do not rely on an apparatus or do not transform a material to a different state or thing (the so-called "machine-or-transformation" test).

### More can be done

The courts, however, have yet to deal with at least three other important issues fueling the attraction of the patent troll business model to institutional investors and financial speculators. Two of the issues—awarding of damages that are reflective only of the economic contribution of an invention to a product

and the selection by patent trolls of the court to adjudicate their lawsuits—were highly debated and considered by Congress in the Patent Reform Act, which failed passage in 2008. Let's consider each in turn.

The importance of "proportional damages" revolves around the effort by patent trolls and also operating companies seeking to enforce their own patents—particularly in the high-tech industry—to claim damages against the total price of a finished product, or the totality of revenue for a service, regardless of the economic contribution of the infringing element of that product to the product's total value. So, if a $5 integrated mouse is contained in a $2,000 laptop computer, the licensor would claim that the mouse was essential to the total value of the computer, and seek a multiple percentage royalty against each $2,000 laptop that contained the allegedly infringing mouse, as opposed to a multiple percentage royalty of the $5 mouse.

Congress failed to resolve this damages debate because of differing views between major industries. Broadly, the battle lines pitted primarily some high-tech companies against pharmaceutical companies, which expressed concerns that limiting damages only to the economic contribution of the invention *per se* would weaken their ability to deter competitors seeking to undermine their patent-protected products. Those opposing the language related to proportional damages, in addition to the pharmaceutical industry, included certain high-tech companies and non-practicing entities.

With respect to the "venue" debate, the importance of the selection by plaintiffs of the court in which they choose to file a patent action involves the ability of plaintiffs to "shop" for the most favorable forum to file infringement actions. Basically, patent trolls and businesses trying to enforce their own patents seek out jurisdictions that have demonstrated by their results that they are friendly and generous toward patent holders, and relatively fast. More money as fast as possible is the motivation.

There are few restrictions that preclude a plaintiff from selecting a forum of their choice, even if

FIGURE 4
**Court shopping**
*Patent trolls' choice venues for their lawsuits in the United States*

| Court | NPE as Plaintiff | | NPE as Defendant | | Total Cases by NPE |
|---|---|---|---|---|---|
| | No. of Cases | % of Total | No. of Cases | % of Total | |
| Eastern District of Texas | 332 | 94% | 20 | 6% | 352 |
| Northern District of California | 156 | 70% | 66 | 30% | 222 |
| Central District of California | 152 | 86% | 25 | 14% | 177 |
| Souther District of New York | 122 | 92% | 10 | 8% | 132 |
| Northern District of Illinois | 100 | 93% | 8 | 7% | 108 |
| Northern District of Georgia | 76 | 92% | 7 | 8% | 83 |
| Delaware | 57 | 69% | 26 | 31% | 83 |
| Eastern District of New York | 73 | 94% | 5 | 6% | 78 |
| New Jersey | 56 | 88% | 8 | 13% | 64 |
| Southern District of Florida | 56 | 97% | 2 | 3% | 58 |

Source: PatentFreedom © 2008. Data captured as of August 31, 2008.

neither the plaintiff nor defendant has reasonable nexus to the chosen venue. Entities that are generally the defendant in patent litigations (which tend to be businesses, and particularly businesses confronted by NPEs as well as other businesses) were generally supportive of reforms that would limit venue shopping, whereas plaintiffs were generally opposed to such reforms. Figure 4 depicts the jurisdictions of choice.

It would seem reasonable that Congress or the courts will ultimately limit this forum-shopping ability as this wasn't as germane to the failure of patent reform in Congress as was the conflict over the apportionment of damages. All that's required is that the jurisdiction in which the case is heard must be reasonably tied to the dispute at hand. The recent 5th Circuit decision in *In re Volkswagen* AG in October 2008, which ordered Judge Ward in the Eastern District of Texas to transfer a case to Dallas where the events surrounding the case occurred, appears to signal the federal court's willingness to tackle these difficult issues.

A final step that should to be taken is for Congress to adopt a law that requires unsuccessful patent plaintiffs to bear the cost of their adventurous litigation in court. Today, particularly plaintiffs that use contingent law firms (as do many NPEs) incur

minimal risks when filing an infringement suit. Only two things can happen—the target settles and pays money to the plaintiff, or the target refuses to settle, goes to trial, and the plaintiff wins or loses. But even if the plaintiff loses, the only cost it has incurred is its legal fees, and therefore the NPE only absorbs out-of-pocket expenses.

Adopting a system where plaintiffs or a successful defendant in a patent-related declaratory judgment action would have to pay the target's costs if the case fails would provide a substantial brake on adventurous litigation. Such a law would force all patent holders—patent trolls and businesses alike—to thoroughly investigate infringement actions prior to approaching a potential licensee with the threat of a lawsuit. It would dramatically curtail the amount of contingent litigation pursuing weak claims of infringement, a mainstay of most patent trolls, and yet it would permit the vigorous enforcement of strong patent rights.

If there were only one action that could be taken, then I believe a law to oblige unsuccessful patent enforcers to bear the costs of their lawsuits would be by far the most important and useful, yet likely the most difficult to achieve, since those that make a living from this practice will lobby extremely hard to avoid enactment of the required legislation.

sp | Patent Reform

## CONCLUSION

Patent trolls amass fortunes by using purchased patents to reap profits from those who commercialize innovation, raising costs to consumers, and retarding innovation. These effects hardly promote the public policy on which the patent system was created. But for the government's grant of a patent, the sole means of exploiting an invention is to put it in a product and offer it for sale. Fostering the commercialization that spurs economic growth must certainly be at least as important as fostering invention. Patent trolls damage invention and commercialization by exploiting their unfair advantage in the market. They increase barriers to entry for new companies that might otherwise lower prices through competition, while at the same time raising the cost to consumers for the use of the patents that NPEs purchase from others for the primary, if not sole, purpose of pursuing profit.

Fortunately, the courts have already begun to intervene to address this dangerous phenomenon. The Federal Trade Commission's 2003 report on intellectual property, coupled with other studies, such as the National Academies' *A Patent System for the 21st Century*, subsequent studies by academia, industry, and other stakeholders, and numerous congressional hearings, have individually and collectively played a significant role in stimulating the courts to act.

The FTC, the courts, Congress, the U.S. Patent and Trademark Office, and patent applicants and owners can each take further measures to address this aggressive threat. Our nation's prosperity and security will be the beneficiary of prompt and vigorous action.

*Daniel P. McCurdy is chief executive officer of Allied Security Trust and chairman of PatentFreedom.*

# The Legal Infrastructure of Business

Prof. Randal C. Picker, Chicago Booth 42201, Fall, 2012

October 09, 2012

## Patent trolls and Silicon Valley's parasitic new industry

The New York Times article from yesterday regarding the explosion in patent litigation and the controversy over modern patent law raised some interesting points, but actually barely scraped the surface on just how deep this issue goes.

Entrepreneurially spirited individuals, not being dummies, have realized the potential upside to these ongoing legal battles. With $20 billion being spent over the last two years on patent litigation, and single case settlements ranging from $1 million to the hundreds of millions, "patent trolls" are springing up and attempting to collect on the ambiguity of software patent law.

[There is a correction in connection with the following pargraph; please see this post.]

In fact, this has been going on for years. Rates Technology, Inc., classified by PatentFreedom as "non-practicing entity" (a company that neither designs nor distributes anything), has used its tiny portfolio of patents (just two have been used in litigation) to sue over 100 companies since the 1990s. Though CEO Jerry Weinberger vehemently defends his company as a licensing firm, the line between a settlement and a pre-emptive payout backed by a "covenant not to sue" appears to be a fairly fine one. Weinberger's latest battle may go all the way to the Supreme Court, if he has his way, and may lay the groundwork for some legal clarification on the business of patent trolling. Covad Communications, which faced a licensing deal demand from Rates after it merged with a company that had previously held one of these so-called licenses, sued preemptively to challenge the Rates patents. Rates claims that violated the original covenant not to sue, and despite the conflicting messages in their two stances, is appealing two court decisions that both validated the Covad standpoint.

The undisputed king of the patent trolling industry so far is Acacia Research. In 18 years, they have filed 337 lawsuits and are projecting revenues of $68.8 million in 2012 on their portfolio of patents –with income solely coming from licensing and settlements. Indeed, both Apple and Samsung paid upwards of $50 million to the company for three-year licenses to avoid getting into the kind of legal battle they ended up having with each other.

That's one way of looking at the issue. It's not all litigation-happy companies hoping to make a quick buck by suing the defenseless corporations, however. The trolls themselves defend their position by pointing to examples like Paul Ware, who designed a credit fraud protection system in the 1970s but was unable to get funding and did not collect any revenues until he sold the patent to Acacia. On the other side of the spectrum, companies like Vringo are championing the movement to protect American patentholders by chasing after foreign corporations allegedly stealing our designs. It is currently suing China's ZTE Corp. for infringement on its recently acquired portfolio of 500 patents from Nokia. Though ZTE was successfully sued by Ericsson in January for a similar issue, the fact that the next lawsuit in Vringo's pipeline is a Google case potentially worth billions does seem a bit suspect.

So far, the Supreme Court specifically has not been friendly to those looking to sue over software patents. In 1972's *Gottschalk v. Benson* decision, the Court unanimously rejected an application for an algorithm, claiming:

The mathematical formula involved here has no substantial practical application except in connection with a digital computer, which means that, if the judgment below is affirmed, the patent would wholly preempt the mathematical formula and, in practical effect, would be a patent of the algorithm itself.

They went further in 1978's *Parker v. Flook*, when despite the fact that an algorithm for monitoring chemical reactions had a clear application, the Court rejected that patent as well. Instead, they claimed, the decision on what qualifies as a patent should be left up to Congress. The Federal Circuit Court has been far more permissive, interpreting *Flook* loosely in 1994 to allow patents in cases where the algorithm allowed a program to actually perform some action.

It's clear that until the court system takes a firm stand on the nebulous issue of patent software, the emerging patent litigation "industry" will only continue to grow, and may eventually stifle technology companies to the point of inaction.

Sources:

http://www.nytimes.com/2012/10/08/technology/patent-wars-among-tech-giants-can-stifle-competition.html?pagewanted=all&_r=0

http://arstechnica.com/tech-policy/2012/10/pioneering-patent-troll-seeks-the-supreme-courts-cardius-a-cool-12-million/

http://www.businessweek.com/stories/2010-02-01/acacia-the-company-tech-loves-to-hatebusinessweek-business-news-stock-market-and-financial-advice

http://www.reuters.com/article/2012/10/08/idUS97177108-Oct-2012+HUG20121008

http://arstechnica.com/tech-policy/2009/01/resurrecting-the-supreme-courts-software-patent-ban-not-ready/2/

Posted by Stacy Tumarkin on October 09, 2012 at 08:00 PM | Permalink

**Comments**

How we treat software patents needs a rework. The technology industry is rapidly becoming a software-dominated industry with the rise of open source code, agile development, the ability to cheaply outsource software development, and the ability to "ship code" virtually through wires, rather than through hardware and physical disks. I think this makes it harder to really nail down whether or not a piece of software--which is just syntax and algorithms--is patentable. It's much easier to discern uniqueness and obviousness from a physical object than from millions of lines of code (this holds especially true for non-technical judges). However, software inventions must be protected in order to encourage ingenuity, and furthermore, patent "trolls" should be allowed to buy patents and sue against them. Non-practicing Entities allow inventors with few resources to commercialize their product to still get paid for their ingenuity. It creates a larger market for them. Why should the Googles, Apples, and Microsofts have a monopoly over ingenuity?

In my opinion, one solution to the software patent problem is to reduce its protection to only a timeframe of several years. This would match up well against progress made in software. Each year the rate of innovation in tech increases, and my hunch is that most of the economic value of a software patent comes in the first few years anyway. By shortening the timeframe, it will allow startups to not have to worry about the web of patents that lies before them and thus not hinder their own innovation.

Posted by: GT | October 21, 2012 at 06:08 PM

The comments to this entry are closed.




A DAILY JOURNAL PUBLICATION          THOMSON REUTERS

HOME    MAGAZINE    SUBSCRIPTION    CONTACT US    ABOUT US    CLE CENTER    LEGAL RESOURCE CENTER    JOBS

Search

# Patently Contentious -- Fighting Patent Trolls

January 2010



Greg Hargreaves/Photo Gallery

💬 Comment

🖨 Print

📄 Reprint

by Rene Ciria-Cruz

To corporate counsel in the high-tech industry, being attacked by nonpracticing entities (NPEs)?also known pejoratively as trolls?is very much like coming under siege. As usually defined, NPEs create no products from the high-tech patents they own. Corporate counsel see them as just racking up earnings by taking other companies captive, releasing them only for a handsome ransom of licensing fees?or the damages awarded in a patent-infringement lawsuit. And just like during a military offensive, such activity can leave a company cut off from the open market, often tying up product development and locking it into costly litigation.

There's no question patent litigation is expensive. For a single defendant fighting a patent claim?with $1 million to $25 million sought in damages?the average cost of litigation last year was $3.1 million, according to the American Intellectual Property Law Association (AIPLA). In 2005 Microsoft said it was spending close to $100 million annually to defend itself against 35 to 40 patent actions at any given time.

"The troll's lawsuit can cripple a business. It's disgusting," fumes Lee Cheng, general counsel of Newegg, the Internet electronics retailer based in City of Industry. "The patent troll patent-infringement lawsuit is replacing securities class action as the extortionary weapon of choice in the business world," says Cheng.

But these days, high-tech firms are arming themselves to the teeth. They are challenging the very patents NPEs wield against them, staring down the NPEs with aggressive litigation tactics, and pooling resources with many companies to fight the onslaught of patent-infringe-ment claims.

NPEs have been around for more than 15 years, but their numbers grew sharply during the dot-com bust. Today, they are as busy as ever: More than 280 NPEs are active in patent litigation. In the year ended September 2008, 2,909 patent infringements were filed, including 514 in California. And for the 850 U.S. patent suits brought in the first four months of last year, patentees in 14 percent of the cases were nonpracticing entities, reports the trade group Global Semiconductor Alliance (GSA).

Three licensing companies?Acacia Technologies, Rates Technology, and Ronald A. Katz Technology Licensing?filed the most litigation from 2003 to 2008, according to research group PatentFreedom. But Acacia Technologies is no troll, says Paul Ryan, the chief executive officer of its parent company, Acacia Research of Newport Beach. Small firms and universities "outsource the licensing of their patents to us," Ryan says. " 'Trolls' is what small companies are called for doing what big companies do, which is make a profit off of their patents."

"Remember," Ryan adds, citing figures from Intellectual Ventures, another NPE, "60 percent of all patents are owned by small companies, universities, and the like, while big companies that 'doth protest too much' earn 99 percent of the profits from the fewer patents they own."

Further muddying the waters is that accusations of trolling are hurled against some well-known companies that do create their own technologies. Los Altos?based Rambus, a provider of high-speed chip interfaces, is among them. But its senior vice president and general counsel, Tom Lavelle, laughs off blogs that rebuke the company for "trollish" behavior.

Rambus, Lavelle says, has developed its own technology since 1990. And most of the patents it licenses have been developed in-house. "We've mainly decided not to concentrate on manufacturing our own products and to go the licensing route. If that makes us a troll, then a lot of other major corporations who cross-license their patents are too."

Rambus has sued for patent infringement at least eleven times since 2000. Compared with NPEs, PatentFreedom reports, Rambus ranks sixth in the number of patent families owned (a patent family is a single invention patented in several countries). "Inventors must be justly compensated



# JEFF KICHAVEN
### COMMERCIAL MEDIATION

888-425-2520   jk@jeffkichaven.com



Your Best Advantage in Today's World

www.LMIC.com
or call us at (800) 252-2045
Lawyers' Mutual Insurance Company
Professional Liability Insurance for Lawyers

ROUNDTABLE

|  |  |
|---|---|
| INTELLECTUAL PROPERTY | An update with Finnegan, Henderson, Farabow, Garrett & Dunner; McDermott Will & Emery; Womble Carlyle Sandridge & Rice, co-moderated by Jeff Kichaven. |

EXPERT WITNESS RESOURCE GUIDE

Other Resource Guides

| Technology Resource Guide | CLE & Office Resource Guide |
|---|---|
| Courtroom Resource Guide | ADR Resource Guide |
| Recruitment Resource Guide |  |

DEVELOPMENTS IN PATENT LAW

Efforts are under way to address some of the complexities of patent enforcement, although it's too early to predict success.

On November 9, for example, the U.S. Supreme Court heard a high-profile case involving an appeal from the Federal Circuit's en banc rejection of a patent application for a business method of hedging risk in commodities trading (In Re Bilski, 545 F.3d 943 (Fed. Cir. 2008) (en banc), cert. granted, 129 S. Ct. 2735 (2009)). The circuit court's en banc majority cited Supreme Court precedent when it

for the use of their intellectual property, or innovation will be killed," insists Lavelle. "IP and its protection made this country Number One. If the [court] trials are very long and you spend hundreds of millions of dollars protecting your patent, and yet you get only a smaller amount in damages, what's the point in inventing anything?"

Still, filing patent-infringement claims can be a lucrative business model. In 2009 the resulting legal fees and settlement payments were more than $3 billion, estimates the GSA. Meanwhile, the median damage award won by patentees from 2005 to 2009 was $5.29 million, according to Professor Paul Janicke of the University of Houston Law Center.

With millions of dollars to be made, patent holders use a variety of tactics to protect their intellectual property. Often, critics say, NPEs will buy and enforce broad software and business-process patents that shouldn't have been granted in the first place. "Software isn't intended to be patented," says Newegg's Cheng. "You can't patent software in the European Union or China."

Defendants blame underfunding and understaffing of the U.S. Patent and Trademark Office (USPTO) for the preponderance of questionable patents. "Any new wave of technology is hard for the USPTO to keep up with, since they lack the necessary experts. That's how many dubious patents get past it," says Cheng.

Another way that NPEs attack tech companies is by filing claims with multiple defendants?even dozens. This causes "defense-coordination problems, court-management issues, and drives up litigation costs," says Emily Ward, associate general counsel for patents at eBay. The online auction pioneer has successfully defeated a number of NPE lawsuits, including claims brought by Netcraft, MercExchange, and one by Acacia subsidiary Peer Communications against Skype (which eBay then owned).

Defense attorneys say multidefendant cases let NPEs pick off defendants that can't afford to go to trial and are willing to settle. For example, reports Cheng, Newegg's four co-defendants in a patent-infringement claim that Soverain Software filed in 2007 have opted to settle. In an email, Soverain denied that it is a "troll," pointing to its flagship product, Transact, which it has sold to customers in 25 countries. Citing pending litigation, the company declined to comment further.

NPEs are also increasingly trying to outflank defendants by filing claims in the U.S. International Trade Commission (USITC), a quasi-judicial federal agency that probes trade matters and adjudicates cases involving imports that allegedly infringe intellectual-property rights. The USITC doesn't award damages, but "it can issue an injunction against your imported product, forcing you to settle," Cheng says.

Another long-standing NPE strategy is to file suits in jurisdictions and venues where trials go faster and the damage awards are more generous. The win rate in the Eastern District of Texas, for example, is the same as in other districts, but the trials usually conclude much more quickly. Plus, the median damage award there in the past five years was between $34 million and $41 million, says University of Houston's Janicke. That compares with a $7 million median in the Central District of California?the third busiest venue, after the Northern District of California and the Eastern District of Texas.

But this strategy is starting to catch up with NPEs, and the number of patent claims filed in the Eastern District of Texas is now falling: The heavy caseload has caused delay; it now takes from 26 to 30 months to get to trial, according to AIPLA. And though patent work now comprises up to 30 percent of the district's cases, it amounts to 75 to 80 percent of Eastern District Judge T. John Ward's workload, he told the association. The district also has come under criticism from the Federal Circuit, which has urged the Eastern District to limit the number of cases it takes by requiring that parties have more substantial links to East Texas before allowing a claim to proceed.

Also, just last month, the Federal Circuit gave NPEs a setback in the form of a new strategy that patent-infringement defendants can use to influence selection of the trial venue. The court ruled that a company receiving notices of possible infringement from a patent holder can sue for declaratory relief, even if the notices don't explicitly threaten litigation (*Hewlett-Packard Co. v. Acceleron LLC*, 2009 WL 4432580 (Fed. Cir. 2009)). Such preemptive litigation gives the potential target of the NPE more control over the venue choice under the "first to file" rule that courts routinely apply. The key is making sure the first case has proper jurisdiction to begin with. (*See Acceleron, LLC v. Egenera, Inc.*, 634 F. Supp. 2d 758 (E.D. Tex. 2009).)

To be sure, accused patent infring- ers have been sharpening their defenses. If their opponent is a corporation that also uses patents, for example, they may counter-sue for unfair competition or trade-secret violations.

But because NPEs don't create products, it's often impossible to sue them for patent infringement. So defendants are also increasingly requesting patent reexaminations at the patent office. For example, in November Santa Clara?based Nvidia?which develops graphics-processing units and chipset technologies?succeeded in getting the USPTO to reject several Rambus patents.

"Defendants might allege that new prior art invalidates the claims of a patent, and this can lead to the cancellation of a plaintiff's patent and a stay of litigation while reexamination is taking place," explains Matthew Brigham, an IP litigation partner at Cooley Godward Kronish in Palo Alto.

Rambus's Lavelle laments this tactic as unfair to the plaintiff: "The 'request for patent invalidity' defense essentially gives the defendants two separate proceedings-your patent's validity is already

noted that to be patentable, a process must be "tied to a particular machine or apparatus" or must transform "a particular article into a different state or thing." (545 F.3d at 954 (citing *Gottschalk v. Benson*, 409 U.S. 63, 70 (1972).)

During oral argument, the justices appeared to be skeptical of business-method patent claims. This cheered Bilski opponents such as Google and Red Hat, and Internet retailers such as Newegg and Crutchfield. Fearing that the court ruling might have the effect of expanding business-methods patentability to include software, several of the companies filed a joint amicus brief claiming they've "paid dearly" to NPEs for using processes that shouldn't have been patented. Software patents stifle innovation, some software developers argue, because developers trying to make their applications compatible with others constantly risk infringing on existing patents.

Some companies, such as Accenture and Pitney Bowes, support the Bilski patent. But others, such as IBM, think the Bilski patent was properly denied, even though they support strong patent rights for software. Microsoft, Symantec, and Philips, likewise contend that the Bilski patent was properly denied, but they oppose the Federal Circuit's strict "machine or transformation" test for patentability, contending it is hard to implement.

Congress also is trying to do its part for reform with a number of proposed changes to patent law, including measures that would reduce damage awards for patent-infringement claims. But the proposals have sparked clashes between tech firms and a biotech-pharmaceutical-NPE alliance. With much longer product-development cycles, biotech and pharmaceutical companies are anxious to retain maximum protection for their products.

As a result, Lee Cheng, general counsel of Newegg, is skeptical about the chances for real reform. "Big interests are in the way," says Cheng. "The pharmaceutical and biotech industries defend the patentability of incremental change." -RC

being examined in court, and yet it's also being scrutinized by the USPTO. Defendants get two bites of the apple."

Lavelle is also critical of another common defense tactic?the spoliation charge?which involves a contention that a party has destroyed evidence. "The problem with the spoliation charge is it allows the other side to put the plaintiff on the defensive," he says. "Even though discovery rules leave some room for human error, the rules of discovery are such that any misstep you make in retaining a document can make you vulnerable to the spoliation charge."

In addition to these defense tactics, some big corporations with deep pockets are simply going toe-to-toe with the NPEs in court. For example, Google intends to curb the growth of NPE lawsuits by going to trial rather than settling, Catherine Lacavera?a senior litigator at Google?told Bloomberg.com last February. Ebay has adopted a similar policy, Ward confirms.

In *eBay Inc v. MercExchange, L.L.C.* (547 U.S. 388 (2006)), the U.S. Supreme Court ruled that an injunction shouldn't automatically be enforced against eBay simply because it allegedly infringed an online technology patent owned by MercExhange. "Thank God for eBay taking on MercExhange all the way," says Cheng. "And thank God for Microsoft taking a leading role in deterring NPEs by not settling." Bloomberg reports that BlackBerry-maker Research In Motion also has adopted an aggressive defense against NPEs.

Finally, many companies are using a new weapon against NPEs: the defensive patent aggregator (DPA). In a business model that emerged two years ago, a DPA buys patents or patent rights strictly to provide inoculation against NPEs; it then issues licenses to companies it signs up as clients, based on an annual membership fee.

San Francisco?based RPX, a membership-based company funded by three venture capital firms, chooses and purchases patents for its members for between $35,000 and $4.9 million in annual fees (these depend on a member's operating income). RPX has bought at least 1,000 U.S. and international patent assets since it started in 2008, and its current members include Cisco, IBM, Samsung, Hewlett-Packard, and TiVo.

Another DPA is the nonprofit Allied Security Trust of Lambertville, New Jersey, whose CEO founded PatentFreedom. It has 15 member-companies, all of them with annual product revenue above $1 billion. Members contribute to an escrow fund for buying patents, and they participate in purchasing decisions. Among its members are Hewlett-Packard, Cisco, Motorola, Avaya, Ericsson, and Philips.

To Lavelle, defensive patent aggregation "isn't necessarily a bad idea. It emphasizes the value of patents and strengthens the market for them." But it provides only limited immunity from infringement claims, he says, adding, "Your aggregator provides you licenses for specific patents, but if your product uses more patents than it has licenses for, you're still vulnerable."

*Rene Ciria-Cruz is an associate editor at California Lawyer.*

---

Reader Comments

Comment by oscar villalta - January 5, 2010

Very nice.

### Add your Comment

California Lawyer reserves the right to delete any letter at its discretion; we may remove letters that are off-topic, crude or vulgar, are of low quality or that violate the law or common decency. California Lawyer also reserves the right to edit any letter for use in its print publication. By posting a comment, California Lawyer does not necessarily endorse the views expressed.

---

* indicates required field

*Please enter your name:

*Please enter your E-mail: (will not be published)

*Comment



See how we can jump-start your startup marketing efforts Learn more

# MARK EVANS TECH

EXPLORING THE WORLD OF STARTUPS AND ENTREPRENEURS

*Meet*
**MARK**

| ME CONSULTING | SPEAKING/WORKSHOPS | ABOUT | PRIVACY | CONTACT | Search the site... |



NEED SOME HELP?

## LET'S TALK

**Learn how we** work with
**startups and entrepreneurs to
create marketing strategies
and tactical execution**

FOLLOW ME



READ ME



SUBSCRIBE TO MY WEEKLY
STARTUP NEWSLETTER

SUBMIT

## WHO'S RATES TECHNOLOGY INC.?

DECEMBER 29, 2005 MARK EVANS

In Canada, we've become super-sensitive to litigious
patent holders given how NTP Inc. has being making life
difficult for Research in Motion for the past four years.
So, it's fascinating to see Rates Technology Inc. jump
into the spotlight by suing Google for infringing on its
VOIP patents. (Here's the lawsuit.) Like NTP, RTI is
nothing more than a shell that holds patents and
pursues licensing agreements. To be perfectly blunt, RTI
is what NTP aspires to be when it grows up given RTI
has agreements with more than 700 companies on a
one-time, one-fee basis. In the patent world, once you
bag a big prize (e.g. RIM), it's so much easier to
convince other company's to enter into licenses. RTI's
"hit list" features a who's who of the telecom world such
as Lucent, Cisco, Nortel and Huawei. RTI's lawsuit
activity has targeted Mitel Networks for $945-million
and Alcatel for $1.15-billion. Rich Tehrani provides a lot
of the juicy details about RTI following a conversation
he had with RTI's Jerry Weinberg. If RIM's battle with
NTP and RTI's licensing track record is any indication,
Google would be wise to settle quickly to make RTI go
away. From a bigger-picture perspective, do you think
the activities and RTI and NTP will build momentum to
look at how the U.S. Patent and Trademark Office issues
patents. In particular, it seems like there could be a
backlash against the broad patents the USPTO grants,
which have given many patent holder enormous legal
clout because defendants have such a difficult time
demonstrating they aren't infringing them. The key
issue is whether these broad patents will deter
innovation if patent "trolls" can easily solicit licensing
fees out of companies developing new technology.
Update: The National Business Review has published a
story on patent "trolling", citing Rich Tehrani's
interview.

This entry was posted in Google, Main Page, VOIP Services, Competition. Bookmark the permalink.

ME Consulting., 2012. All rights reserved.   Privacy   About   Contact



# What Is a "Patent Troll"?

Does not practice or commercialize patented inventions

Acquires and holds patents solely for litigation and licensing

"nonpracticing entity" (NPE)
"patent holding company"

WINSTON
&STRAWN

# Top 10 Most Active Trolls

WINSTON
& STRAWN
LLP

| | Lawsuits (2005-Present) | Defendants (2005-Present) |
|---|---|---|
| Acacia Technologies | 209 | 678 |
| Ronald A Katz Technology Licensing | 111 | 197 |
| Millennium LP | 78 | 68 |
| Erich Spangenberg | 74 | 515 |
| Sorensen Research and Development Trust | 64 | 80 |
| Guardian Media Technologies Ltd | 52 | 78 |
| F&G Research Inc | 46 | 42 |
| Rates Technology Inc | 41 | 35 |
| Catch Curve Inc | 37 | 68 |
| ArrivalStar | 36 | 101 |

Patent Freedom Research (2010), available at https://www.patentfreedom.com/research.html

# Trolls' Distinguishing Characteristics

Surprise Attacks

Many Defendants

Immune to Counterclaims

Bad Patents

WINSTON
& STRAWN
LLP



WMACCA Technology and IP Forum:

# What Are Patent Trolls and How Do They Affect Your Business?

**Panelists:**

Jean C. Edwards, Akerman Senterfitt LLP
Paul F. Neils, Akerman Senterfitt LLP

**Moderator:**

Michael Wu, Rosetta Stone Inc.

ACC AMERICA
Association of Corporate Counsel
WMACCA Chapter

Akerman

Copyright © 2009, 2010 Jean C. Edwards. All rights reserved.

This presentation is for informational purposes only and is not to be reproduced for purposes other than those expressly authorized by the author. The author retains full ownership of copyright in this presentation and reserves the right to repurpose this presentation in current or other form.

# What is an NPE?



- Non-practicing entities (NPEs), commonly known as "patent trolls", buy patents from companies (often bankrupt ones) at a cheap price.  In other cases, they produce patents in-house.

- NPEs are companies that do not sell products or services in the marketplace, but instead license intellectual property and enforce patents they hold.

- NPEs derive the majority of their income from enforcement of patent rights and often benefit greatly from large patent infringement judgments or settlement dollars.

**Note:** What constitutes a "patent troll" is open to interpretation and varies amongst commentators.  Use of the term "patent troll" is based on opinion and not fact and use of the term herein does not necessarily reflect the opinion of the presenters, WMACCA, or Akerman Senterfitt.  Portions of this presentation contain statistics and litigation details that have been compiled from various news articles and do not reflect the first hand knowledge of the presenters, WMACCA, or Akerman Senterfitt.



3


Akerman

# NPEs and Their Effect (contd.)

- Moreover, those NPEs that are heavily litigation-focused have substantially increased the scope and pace of litigation. This increase takes two forms.

  - ▽ The first is the absolute number of litigations filed, and

  - ▽ The second is the number of defendants named in each lawsuit, which if properly reflected, substantially increases the scope and scale of NPE litigation.

- Companies such as Intellectual Ventures (the largest NPE), 1st Technology, ArrivalStar, Cygnus Telecommunications Technology LLC, Freedom Wireless, Inc, Millennium LP, and Rates Technology, derive or plan to derive the majority of their revenues from patent enforcement—but rather than buying patents created by others, they primarily or exclusively license patents created by their employees or owners.

- Finally, another category involves individual inventors who have chosen to enforce their patents as the primary means to derive revenue from them.

7

# Top 10 NPEs
## by number of patent lawsuits they have filed

Akerman

| NPE Name | Total Cases | % increase since 2003 |
|---|---|---|
| 1. Acacia Technologies | 337 | 80% |
| 2. Rates Technology Inc. | 139 | 33% |
| 3. Ronald A Katz Tech. | 129 | 92% |
| 4. Millenium LP | 110 | 92% |
| 5. Plutus IP | 77 | 100% |
| 6. Sorenson Research & Develop. | 73 | 88% |
| 7. General Patent Corp. Intl. | 72 | 58% |
| 8. Cygnus Telecom. Tech. | 69 | 45% |
| 9. Papst Licensing | 62 | 55% |
| 10. F&G Research | 56 | 91% |

Source: PatentFreedom © 2010 data captured as of January 1, 2010.

Akerman

# Leading NPEs (contd.)

**Rates Technology, Inc. (RTI)**

- RTI provides notice to companies of RTI's patents, and the companies are obligated to find out if they infringe any of RTI's patents. If the companies want a license, a one-time fee is paid to RTI based on the highest parent companies' worldwide sales. In exchange the companies obtain a license and a covenant not to sue from RTI.

- RTI made headlines in October 2005 when it sued Google Inc. for $5 billion regarding infringement of RTI's internet voice calling patent. This lawsuit was settled in April 2006.

22